UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

FRANKIE CORTES,

          Plaintiff,

   -v-                               No.  08 Civ. 4805(LTS) (RLE)

THE CITY OF NEW YORK et al.,

          Defendants.
-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

      Plaintiff Frankie Cortes, a former Corrections Officer with the New York City

Department of Correction ("DOC"), brings this action pursuant to Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. §§ 1981 and 1983 ("Section 1981" and "Section 1983"), the

First and Fourteenth Amendments to the United States Constitution, the New York State Human

Rights Law, codified at N.Y. Exec. Law § 296 ("SHRL"), and the New York City Human Rights

Law, codified at N.Y.C. Admin. Code § 8-101 et seq. ("CHRL"), alleging retaliation and

discrimination on the basis of his gender and race.  The Court has jurisdiction of the federal

claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and supplemental jurisdiction of

the state law claims pursuant to 28 U.S.C. § 1367.  Defendants City of New York, DOC, Diane

Carn, Neil Schulman, and Richard Palmer (collectively "Defendants") now move pursuant to

Federal Rule of Civil Procedure 56 for summary judgment as to all claims.   The Court has

considered thoroughly all of the parties' submissions.  For the following reasons, the Court

grants Defendant's motion in its entirety.

## BACKGROUND

      The following facts are drawn from the parties' submissions, and are undisputed

unless otherwise indicated.[1]  Plaintiff was employed as a Correction Officer ("CO") at the DOC

until his termination on February 22, 2007. (Defs' 56.1 Stmt. ¶ 4.)  Plaintiff alleges that, on June

21, 2002, while working at the Bronx Criminal Court, he was assaulted by two female COs,

Sadie Smith ("Smith") and Sheena Thompson ("Thompson"). (Id. ¶ 5.)  According to an internal

investigation report, Smith and Thompson accused Plaintiff of destroying the phone wires in

Smith's post, and both insinuated that he had vandalized Smith's car. (Ex. I, attached to

Declaration of Donna Canfield ("Canfield Decl.").)  In his report memorializing the incident,

Plaintiff stated that he had "no idea as to why [the assault] was committed." (Defs' 56.1 Stmt.

¶ 9.)  Shortly after the assault, Plaintiff met with defendant Deputy Warden Neil Schulman

("Schulman") and demanded that Smith and Williams be arrested for assault and abandoning

their post.  Schulman directed Plaintiff to make a formal request to defendant Warden Richard

Palmer ("Palmer"). (Id. ¶ 11.)

On June 21, 2002, Smith and Thompson were suspended. (Id. ¶ 12.)  In his

deposition, Plaintiff claims that they were suspended for five days "even though it should have

been 30 days for conduct unbecoming." (Pl's Resp. Stmt. ¶ 122.)  A preliminary investigation

recommended that Smith, Thompson, and Plaintiff be "administratively transferred from [the

Bronx Detention Complex ("BXDC")] in the best interest of the command." (Defs' 56.1 Stmt. ¶

14.)  On June 26, 2002, Palmer referred disciplinary charges against Smith and Thompson for the

---

[1]      Facts characterized as undisputed are identified as such in the parties' statements
pursuant to Local Civil Rule 56.1 or drawn from evidence as to which there is no
nonconclusory, contrary factual proffer.  Citations to the parties' respective
S.D.N.Y. Local Civil Rule 56.1 statements ("___ 56.1 Stmt.") and responses
thereto ("___ 56.1 Resp. Stmt") incorporate by reference citations to the
underlying evidentiary submissions.

June 21, 2002, assault.  (Id. ¶ 15.)  Shortly thereafter, Thompson and Smith were transferred to the Bernard B. Kerik Center ("BBKC") and the Anna M. Kross Center ("AMKC"), respectively. (Id. ¶ 16.)  AMKC is not considered a favorable assignment.  (Id. ¶ 19.)  On July 10, 2002, Plaintiff was transferred to the Eric M. Taylor Center ("EMTC"), which is considered a favorable assignment within the DOC.  (Id. ¶¶ 17-18.)  While Plaintiff claims he preferred the BXDC, there is no indication in the record that he made that preference known.  (Pl's 56.1 Resp. ¶ 19.)

In his Complaint, Plaintiff alleges that Schulman "influenced the decision to transfer Plaintiff due to his close relationship with [Smith]."  (Compl. ¶ 59.)  Plaintiff concedes, however, that Warden Palmer, not Schulman, made the request on July 8, 2002 that Plaintiff be administratively transferred.  (Defs' 56.1 Stmt. ¶ 21.)  In a December 2, 2002, response to a Request for Information by an Equal Employment Opportunity ("EEO") investigator, Palmer explained that he had ordered Smith, Thompson, and Cortes' transfer "to maintain a safe environment."  (Id. ¶ 31.)

On August 7, 2002, Plaintiff filed an internal EEO complaint alleging that Smith had retaliated against him for being named as a witness in a previous EEO complaint filed against her by CO Frank Kumpan ("Kumpan"), and that Schulman had retaliated against him by ordering him to write a report on whether he was wearing his vest at the time of the assault and another report addressing an earlier accusation that he was playing loud music on the job, and by ordering his transfer.  (Id. ¶¶ 22-25.)  Kumpan had filed an EEO complaint on May 25, 2002, which listed Plaintiff as a witness to an incident of alleged harassment, despite Plaintiff's request that Kumpan "not . . . involve him."  (Pl's 56.1 Resp. ¶ 118.)  Plaintiff testified that Smith became aware that Plaintiff was listed as a witness and that, "maybe a month after" the Kumpan

complaint was filed, Plaintiff began receiving threatening phone calls calling him a "snitch."

(Defs' 56.1 Stmt. ¶ 28.)  Plaintiff does not claim to have informed any of the Defendants about

these messages.  (Id. ¶ 29.)  Plaintiff did not provide testimony or give a statement in the

Kumpan EEO investigation until August 15, 2002, almost two months after the assault by Smith

and Williams.  (Id. ¶ 30.)  On March 27, 2003, the DOC EEO office found Plaintiff's claim of

retaliation unsubstantiated and determined that Plaintiff was not unjustly transferred.  (Id. ¶ 32.)

On January 23, 2003, Plaintiff submitted a "Request for Transfer" back to BXDC.

(Id. ¶ 34.)  On or about March 10, 2003, Plaintiff was transferred to the Vernon C. Bain Center

("VCBC").  (Id. ¶ 36.)  Shortly thereafter, Plaintiff filed an internal EEO complaint, alleging that

he had been transferred to VCBC in retaliation for his August 2002 complaint against Smith.  (Id.

¶ 37.)  DOC records indicate that, at the time of Plaintiff's request, BXDC was not in need of

additional uniformed staff members.  (Id. ¶ 38.)  VCBC is generally considered a preferable

assignment by correction officers.  (Id. ¶ 39.)  While Plaintiff asserts that he preferred BXDC

(Pl's 56.1 Resp. ¶ 39), he has not proffered any evidence that he conveyed that preference to

Defendants.  Plaintiff testified at his deposition that, after his transfer to VCBC, Schulman

"accommodated him" by giving him his requested tour and preferred post.  (Defs' 56.1 Stmt.

¶ 40.)  On June 18, 2003, the DOC EEO office found unsubstantiated Plaintiff's April 4, 2003,

complaint that his transfer to VCBC was retaliatory.  (Id. ¶ 43.)

On April 10, 2003, Plaintiff filed a Charge of Discrimination with the New York

State Division of Human Rights, alleging that Smith retaliated against him for being a witness in

a previous EEO complaint, and that Schulman treated him less favorably than Smith and

Thompson on account of his sex.  (Id. ¶ 41.)

On July 7, 2003, Plaintiff was designated a "chronic absent," as a result of which he lost his steady tour and was "put on a wheel." (Id. ¶¶ 47-52.)  DOC guidelines provide that "a member who reports sick on twelve (12) or more work days within a twelve month period shall be classified as chronic absent;" they further provide that an individual designated a "chronic absent" may lose certain discretionary benefits such as the assignment to a steady tour. (Id. ¶¶ 48, 50-51).  Although Plaintiff concedes that he was designated a "chronic absent" and deprived of his discretionary benefits in accordance with the DOC guidelines, he asserts – without evidentiary support – that other chronic absentees were not placed on the wheel.  (Pl's 56.1 Resp. ¶ 52.)

Plaintiff testified at his deposition that he attempted to appeal his chronic absent designation, but that Deputy Warden Diane Carn ("Carn") refused to file his appeal. (Defs' 56.1 Stmt. ¶ 53.)  Plaintiff claims that he "was informed by Deputy Warden Carn that she was aware of his litigation . . . and [he] took this to mean that he could expect harsh treatment in retaliation for pursuing th[e] litigation." (Id. ¶ 54.)  Plaintiff also testified that he heard from another Corrections Officer that Carn had stated, "Officer Cortes, I've got something for his ass." (Id. ¶ 56.)  After being placed on the wheel, Plaintiff told Carn that "I'm not going on the wheel," and proceeded to call in sick for two months. (Id. ¶¶ 57-58.)

On April 19, 2004, the U.S. Department of Justice sent Plaintiff a Notice of Right to Sue, and on July 16, 2004, Plaintiff filed an action in this Court against the City of New York and the New York City Department of Correction. (Id. ¶¶ 42-43.)  In February 2005, Plaintiff once again was designated as a chronic absent. (Id. ¶ 62.)

On May 3, 2005, Plaintiff was scheduled to undergo a drug test. (Id. ¶ 70.)

Shortly before the scheduled test date, Plaintiff falsely claimed that his father had died and made

a request for emergency time. (Id. ¶ 64.)  That request was denied and Plaintiff was ordered to

report to the Personnel Captain for "official business."  (Id. ¶ 65.)  Plaintiff testified that he

reported to the Personnel Captain, realized he had no uniform, and returned home. (Id. ¶ 67.)

Once home, he claims to have received a phone call informing him that his "so-called stepfather"

had passed away. (Id. ¶ 68.)  He flew to Cleveland that day to attend the funeral. (Id. ¶ 68.)

After Carn was informed that Plaintiff had missed his toxicology test and that he had a history of

missing such tests, she reviewed Plaintiff's personnel records and discovered that he had

previously lied about visiting his dying father, been written up on charges for failing to submit

documentation verifying his absence, been repeatedly classified as a chronic absent, and been

A.W.O.L. on multiple occasions. (Id. ¶¶ 70-73.)  Carn issued a memorandum stating that

Plaintiff was not to be granted any personal emergency or bereavement time. (Id. ¶ 75).  Carn

issued similar memoranda for other Corrections Officers who had claimed excessive emergency

time. (Id. ¶ 76.)

The Personnel Captain issued Plaintiff a Command Discipline for leaving without

permission on May 3, 2005, and failing to return. (Id. ¶ 75.)  On May 17, 2005, Plaintiff was

ordered to report to Carn's office regarding the Command Discipline and again failed to appear.

(Id. ¶ 78.)  The same day, Plaintiff submitted a memorandum to Warden Robert Shaw,

complaining that Carn was harassing him by requiring him to submit extra documentation

concerning the death of his "father." (Id. ¶ 79.)  Plaintiff also filed a complaint with the DOC

EEO, alleging that Carn discriminated against him by requiring him to submit documentation

verifying his trip to Cleveland and by placing him on the wheel; he alleged that these actions

were motivated by racial and sexual animus and were in retaliation for his "lawsuit . . . against two black females." (Id. ¶ 80.)

On or about May 20, 2005, Plaintiff was brought up on administrative charges for disobeying orders to report, absenteeism, and making false statements about the reasons for his absence. (Id. ¶ 82.)  Plaintiff conceded at his deposition that he had submitted false documentation regarding his absence on May 3, 2005, and that the funeral he attended was not his father's or stepfather's. (Id. ¶ 83.)  On June 16, 2006, an Administrative Law Judge ("ALJ") found Plaintiff guilty of the charges and suspended him for two months ("OATH decision"). (Id. ¶¶ 86-87.)

A month prior to his suspension, Plaintiff had been charged with giving false and conflicting testimony during a May 11, 2006, OATH appearance relating to an earlier investigation into Plaintiff's disappearance from the DOC's Health Management Division ("HMD") on September 30, 2004, the date of a scheduled toxicology test. (Id. ¶ 89.)  Plaintiff had testified at the May 11, 2006, OATH proceeding that upon arriving at the HMD, his then-wife called to inform him that her purse had been snatched, that she was locked out of the house in the rain with her two-year old granddaughter, and that the dog had run away. (Id. ¶ 90.) Plaintiff testified that he left the HMD to "help her out and get her in the house." (Id).  Plaintiff was not initially disciplined for leaving the HMD because he provided a police report for the incident. (Id. ¶ 91.)  However, on or about December 6, 2004, a Confidential Assistant at HMD received a phone call "from an unidentified female who seemed to be crying, claiming CO Franky [sic] Cortes #2395 forced and beat his wife to lie for him when he was supposed to be [drug tested]." (Id. ¶ 92)  Based on this call and discrepancies in his testimony, Charges and

Specifications were referred against Plaintiff for making false statements.  On January 22, 2007,

following a hearing on the charges, an ALJ found Plaintiff guilty.  Because Plaintiff had recently

been suspended for sixty days, the ALJ recommended termination.  (Id. ¶ 99.)  The DOC

Commissioner adopted the recommendation, and the decision was affirmed on appeal.  (Id.

¶¶ 103, 106.)

On November 9, 2007, Plaintiff filed another charge of discrimination

with the Equal Employment Opportunity Commission ("EEOC") based on his termination,

claiming sex and race discrimination and retaliation.  (Id. ¶ 107.)  The EEOC issued a no

probable cause determination.  On or about April 22, 2008, Plaintiff was notified of his right to

sue.  (Id. ¶ 108.)

Procedural History

On July 16, 2004, Plaintiff filed an action in this Court against the City of New

York, the DOC, Schulman, Palmer, and Smith, asserting various claims of sex and race

discrimination and retaliation.  On February 12, 2007, by Stipulation and Order of

Discontinuance, Plaintiff dismissed the action without prejudice.  In a letter to the Court, he

signaled his intent to file a new complaint with a claim based on his termination once his

administrative appeals were exhausted.  (See Ex CCC, attached to Canfield Decl.)  Neither the

Stipulation nor the letter explicitly addressed what impact the discontinuance would have on the

statute of limitations should Plaintiff re-file his claims.  (Id. ¶ 100.)  On May 22, 2008, Plaintiff

filed the instant Complaint.  Plaintiff's first, second, and third causes of action arise out of

Defendants' conduct after July 16, 2004, and respectively rely on Title VII, alleged

constitutional violations, and state law.  Plaintiff's fourth, fifth, and sixth causes of action

accrued prior to that date and rely on the same legal bases.

DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no genuine issue of material fact). A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). The Second Circuit has explained, however, that "[t]he party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Similarly, "mere conclusory allegations, speculation or conjecture" will not suffice to defeat summary judgment. Cifarelli v.Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996); see also Fed. R. Civ. P. 56(e).

I.      Timeliness of the Claims

Defendants argue that Plaintiff's Sections 1981 and 1983 claims that accrued prior to May 22, 2005 – i.e., three years prior to the filing of the present action – are time barred by the three-year statute of limitations for constitutional torts. See Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 331 (2d Cir. 1997). Defendants further argue that all of Plaintiff's Title VII

claims, excepting the claim based on his February 2007 termination, are untimely because (1) Plaintiff failed to file the present action within 90 days of receiving his April 19, 2004, right to sue letter, see 42 U.S.C. § 2000e-5(f)(1), and (2) Plaintiff's remaining claims accrued more than 300 days prior to the November 9, 2007, filing of his EEOC charge. See 42 U.S.C. § 2000e-5(e); Butts v. New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993).

Title VII "precludes recovery for discrete acts of discrimination or retaliation that occurred outside the statutory time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002). Moreover, "each [discrete] discriminatory act starts a new clock for filing charges." Id. at 113. "A discrete act of discrimination is an act that in itself constitutes a separate actionable unlawful employment practice and that is temporally distinct." Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 638 (2007) (internal quotation marks and citation omitted). Examples of discrete discriminatory acts include "termination, failure to promote, denial of transfer, or refusal to hire." Morgan, 536 U.S. at 114. By contrast, a hostile work environment claim will not be barred by the statute of limitations if all acts constituting the claim "are part of the same unlawful employment practice and at least one act falls within the time period." Id. at 122.

Plaintiff argues that all of his pre-July 16, 2004, claims are timely because the 2007 voluntary dismissal of his first action was the product of an agreement, by which defense counsel agreed that the claims asserted in that action could be reasserted in a subsequent complaint. He also argues that his Title VII hostile work environment claim is timely because at last one act – his termination – fell within the statutory period. As explained below, Plaintiff has failed to adduce evidence that would enable a reasonable jury to find that his termination was the product of retaliation or discriminatory animus. Thus, the timeliness of the pre-July 16, 2004,

claims hinges on whether the filing of the first complaint tolled the statute of limitations, notwithstanding the voluntary dismissal.

In New York, a dismissal without prejudice generally renders the dismissed action a nullity for statute of limitations purposes. See Johnson v. Nyack Hosp., 86 F.3d 8, 11 (2d Cir. 1996); Jewell v. County of Nassau, 917 F.2d 738, 740 (2d Cir. 1990). However, in a letter to the Court accompanying the Stipulation of Discontinuance, Plaintiff's counsel explained that he planned on adding a claim based on Plaintiff's recent termination, and expressed his view that a discontinuance rather than a stay would better conserve the Court's resources. (Ex. CCC attached to Canfield Decl.) He further represented:

> I have spoken to [the] . . . attorney for defendants, who consents and joints in this request, without admitting any liability on the part of the defendant. <u>Neither party will be prejudiced if this request is granted</u>, since there was a substantial amount of discovery which did not take place in this matter, such as depositions.

(Id. (emphasis added).) The Court finds that this letter creates a triable issue of fact as to whether Defendants intended to waive their statute of limitations defense. Accordingly, the Court denies the motion for summary judgment insofar as it seeks dismissal of the pre-July 16, 2004, claims as untimely.

However, Plaintiff does not – and cannot – claim that Defendants waived statute of limitations defenses for claims that accrued <u>after</u> the voluntary dismissal. Therefore, Plaintiff's Section 1981 and Section 1983 claims that accrued between July 16, 2004, and May 22, 2005, are barred by the three-year statute of limitations. Such claims include those based on Plaintiff's designation as a chronic absent in February 2005, Carn's May 4, 2005, memorandum denying Plaintiff emergency and bereavement time, and Carn's demand for documentation verifying his funeral attendance. Likewise, Plaintiff's Title VII claims that accrued between July

16, 2004, and January 13, 2007 (i.e., 300 days before he filed his November 9, 2007, EEOC

charge) are barred under 42 U.S.C. § 2000e-5(e).  Nor can Plaintiff bring a timely Title VII

claim based on the June 2006 disciplinary hearings, which resulted in his two-month suspension.

II.    Title VII Claims

    A.    Race and Sex Allegations

            Plaintiff's claims of race and gender discrimination under Title VII are analyzed

according to the three-step burden-shifting framework established in McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973).  Leibowitz v. Cornell University, 584 F.3d 487, 498-99 (2d Cir.

2009).  First, the employee bears the burden of producing evidence to support a prima facie case

of discrimination.  See McDonnell Douglas, 411 U.S. at 802.  To establish a prima facie case of

race or gender discrimination under Title VII the employee must show that "(1) she was within

the protected class; (2) she was qualified for the position; (3) she was subject to an adverse

employment action; and (4) the adverse action occurred under circumstances giving rise to an

inference of discrimination."  Leibowitz, 584 F.3d at 498.  Second, if the employee establishes a

prima facie case, the evidentiary burden shifts to "the employer to articulate some legitimate,

nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas, 411 U.S. at

802.  Third, if the employer articulates a nondiscriminatory reason, "the presumption of

discrimination arising with the establishment of the prima facie case drops from the picture," and

the burden shifts back to plaintiff to show "that defendant's proffered, non-discriminatory reason

is a mere pretext for actual discrimination."  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d

Cir. 2000).  This requires plaintiff to put forward "not simply some evidence, but sufficient

evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by

the employer were false, and that more likely than not discrimination was the real reason for the discharge." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996).

Plaintiff alleges that the following are incidents of race and sex discrimination: (1) his supervisors' refusal to bring criminal charges against Smith and Thompson, or otherwise sanction them; (2) his transfer from BXDC; (3) his supervisor's request that he write two reports – one on whether he was wearing a vest at the time of the June 21, 2002, assault, and a second regarding an allegation that he had been playing loud music on April 9, 2002; (4) Schulman's decision to transfer Plaintiff to VCBC despite his request for a transfer to BXDC; (5) Plaintiff's placement "on the wheel" and loss of steady tour duty; (6) Carn's refusal to appeal Plaintiff's designation as a "chronic absent"; (7) a memo circulated by Carn stating that Plaintiff was no longer entitled to bereavement leave; (8) Carn's request for evidence to substantiate Plaintiff's claim that he was attending the funeral of his father; (9) administrative charges brought against Plaintiff on May 20, 2005, for making false statements and disobeying orders; and (10) administrative charges which resulted in his termination on February 22, 2007.[2]

Plaintiff has failed to produce evidence to support a prima facie case of discrimination. First, many of the above incidents do not constitute adverse employment actions. To be actionable, an action must entail a "materially significant disadvantage with respect to the terms of [plaintiff's] employment such as termination of employment, a demotion . . . , a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Cunningham v. N.Y. State DOL, 326 Fed. Appx. 617, 619 (2d Cir. 2009) (internal citations and quotations omitted).

---

[2]      Incidents (7), (8), and (9) are time-barred. However, as explained below, even if they were timely, they would fail on the merits.

Plaintiff's supervisors' refusal to bring criminal charges against Smith and Thompson, the requests for reports on the assault and allegations of playing loud music, and Carn's request for documentation to substantiate the reasons for Plaintiff's absence clearly do not meet these criteria. As to the two transfers, Plaintiff does not contest that the facilities to which he was transferred were internally viewed as preferable assignments, nor does he allege that the transfers resulted in any downgrades in pay, rank, prestige, or responsibilities. Plaintiff's personal preference that he remain at the BDXC – a preference which he does not appear to have conveyed to anyone – does not transform his transfer into an adverse action. Watson v. Paulson, 578 F. Supp. 2d 554, 563 (S.D.N.Y. 2008) ("A transfer that is truly lateral and involves no significant changes in an employee's conditions of employment is not an adverse employment action regardless of whether the employee views the transfer negatively."); Beyer v. County of Nassau, 524 F.3d 160, 164 (2d Cir. 2008) ("A denial of a transfer may also constitute an adverse employment action, but we require a plaintiff to proffer objective indicia of material disadvantage; subjective, personal disappointment is not enough.") (internal quotations omitted).

Furthermore, Plaintiff has proffered no evidence, direct or circumstantial, from which a fair-minded trier of fact could reasonably conclude that any of the above incidents – whether or not they qualify as adverse employment actions – were the products of discriminatory intent. His third-hand recounting of Carn's remark that she had "something for his ass" is both inadmissible hearsay and, at best, demonstrates personal animus – not animus based on race or sex. See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (conduct complained of must occur "because of" plaintiff's membership in a protected class). Defendants, on the other hand, provide legitimate, nondiscriminatory reasons for each incident. Defendants explain – and Plaintiff does not contest – that he was placed on the wheel, pursuant to DOC regulations, due to

excessive absences; that Carn denied him grievance leave after discovering that he had lied about prior absences and had a pattern of missing toxicology tests; and that the May 2005 administrative charges were brought because Plaintiff had, in fact, disobeyed orders and made false statements to supervisors.  Plaintiff also concedes all the facts underlying the second set of administrative charges – including, among other things, that a woman claiming to be his wife accused him of coercing her into corroborating his story regarding his absence from the HMD, and that he made numerous false statements during an investigative interview.

The only evidence in the record that Defendants acted in a pretextual, discriminatory manner is Plaintiff's own speculation.  However, "a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove." Hicks v. Baines, 593 F.3d 159, 167 (2d Cir. 2010).  Accordingly, the Court will grant Defendants' motion for summary judgment as to Plaintiff's Title VII sex and race discrimination claims.

B.    Hostile Work Environment

To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: "(1) is objectively severe or pervasive – that is, . . . [it] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex [or race]." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). Put differently, the plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys.,

Inc., 510 U.S. 17, 21 (1993) (internal citation and quotation omitted).

Plaintiff's hostile work environment claim fails for the same reason as his race and sex discrimination claims.  There is no evidence that Plaintiff was the object of intimidation, ridicule, or insult, much less that any such mistreatment was the product of discriminatory animus.  Defendants have also proffered legitimate, nondiscriminatory reasons for each of the actions about which Plaintiff complains.   Accordingly, the Court will grant summary judgment as to Plaintiff's Title VII hostile work environment claim.

C.    Retaliation

Like claims of sex and race discrimination, retaliation claims are subject to the McDonnell Douglas burden-shifting framework.  Id. at 1038-39.  To establish a prima facie case of retaliation, an employee must show that (1) he engaged in protected activity under Title VII; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action.  Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).  Title VII's anti-retaliation provision is broadly drawn.  See Deravin v. Kerik, 335 F.3d 195, 203 (2d Cir. 2003).  Section 704(a) of Title VII makes it unlawful to retaliate against an employee, "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a) (emphasis added).  The Second Circuit has held that "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."  Traglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002)

(citing Cifra v. General Elec. Co., 252 F.3d 205, 217 (2d Cir. 1998).  For mere temporal proximity to establish causality, however, the intervening period must be "very close."  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

      If the plaintiff establishes a prima facie case, the defendant has the burden of articulating a legitimate, non-retaliatory reason for the adverse actions, whereupon the burden shifts back to the plaintiff to introduce evidence disproving the legitimate reason offered by the defendant. See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).

      Plaintiff alleges that he was retaliated against on account of his participation in Kumpan's complaint of race discrimination, and his repeated filing of complaints.[3]  The retaliatory conduct he alleges is the same as that underlying his race and sex discrimination claims.

    1.    Plaintiff's Participation in the Kumpan Complaint

      In May 2002, Kumpan listed Plaintiff as a witness, over Plaintiff's objections, to an incident involving allegedly discriminatory remarks by Smith.  In the following weeks, Plaintiff received harassing phone calls accusing him of being a "snitch" and, in June 2002, he was assaulted by Smith and Thompson.  Plaintiff did not testify or otherwise give any statements on Kumpan's behalf until August 2002.  Defendants argue that, while testifying on behalf of an EEO complainant is protected activity, being involuntarily listed as a witness is not.  Because the phone calls and the assault occurred before Plaintiff testified, Defendants contend, Plaintiff cannot establish causality.

---

[3]    Plaintiff also alleges that he was retaliated against for requesting that Smith and Thompson be arrested.  However, he presents no authority showing that such a request is protected activity under Title VII.

The Second Circuit has not addressed whether an individual's involuntary placement on a witness list is protected activity.  However, the Circuit has stressed the breadth of the anti-retaliation clause, which broadly protects an individual who has "participated in <u>any</u> manner" in a Title VII-related proceeding,[4] <u>Deravin v. Kerik</u>, 335 F.3d 195, 203 (2d Cir. 2003) (declaring that the clause is "expansive and seemingly contains no limitations"), and emphasized that the clause must be interpreted "in light of Title VII's overall remedial purpose" of ensuring "unfettered access to Title VII's remedial mechanisms."  <u>Deravin v. Kerik</u>, 335 F.3d 195, 204 (2d Cir. 2003).  Thus, in <u>Deravin</u>, the Circuit declared that even involuntary participation in Title VII proceedings by an employee accused of sexual harassment qualifies as protected activity. <u>Id</u>.  Two years later, in <u>Jute v. Hamilton Sundstrand Corp</u>., the Circuit held that the anti-retaliation clause's protections extended to an employee who was named as a voluntary witness in a Title VII suit, but was never called on to testify.  The Circuit reasoned that it "would be destructive of [the statute's remedial] purpose to leave an employee who is poised to support a co-worker's discrimination claim wholly unprotected."  420 F.3d 166, 175 (2d Cir. 2005).  Based on the reasoning of these decisions, the Court concludes that the anti-retaliation clause's protections also extend to individuals placed on witness lists without their consent.  It would be equally destructive to the statute's remedial scheme to permit employers to retaliate freely against potential witnesses who are in a state of indecision -- especially given that such people are arguably the <u>most</u> susceptible to retaliatory dissuasion.

However, Plaintiff's claim that the phone calls and assault were retaliatory fails for a different reason: only "employers," not individuals, are liable under Title VII.  <u>Wrighten v.</u>

---

[4]      42 U.S.C.A. § 2000e-3(a) (West 2010) (emphasis added).

Glowski, 232 F.3d 119, 120 (2d Cir. 2000).  To hold an employer liable under Title VII for

harassment or retaliation by a co-worker, a plaintiff must "prove that the employer either

provided no reasonable avenue for complaint or knew of the harassment but did nothing about

it." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1180 (2d Cir. 1996) (quoting Kotcher v.

Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 63 (2d Cir.1992)).  This standard requires a

plaintiff to show that "(1) someone had actual or constructive knowledge of the harassment, (2)

the knowledge of this individual can be imputed to the employer, and (3) the employer's

response, in light of that knowledge, was unreasonable." Duch v. Jakubek, 588 F.3d 757, 763

(2d Cir. 2009).  Plaintiff does not claim that he notified anyone about the harassing phone calls.

As for the assault, the record clearly shows that, upon being notified, Plaintiff's supervisors took

immediate action by suspending Smith and Thompson, bringing disciplinary charges against

both, and initiating an investigation which resulted in their transfer to other facilities, at least one

of which was less favorable.

   To the extent that Plaintiff alleges that other adverse actions – e.g.,  his

designation as a chronic absent in July 2003, his placement on the wheel in November 2003, the

denial of bereavement leave in May 2004, or the two sets of administrative charges in September

2004 and May 2005 – were in retaliation for participating in the Kumpan complaint, Plaintiff

claim likewise fails.  He presents no evidence that would enable a jury to find causality, nor

could a jury infer a causal connection from the temporal proximity of those actions to his

participation in the Kumpan complaint.  More than a year elapsed between being listed in the

Kumpan complaint and Plaintiff's designation as a chronic absent; approximately two years

passed before he was denied bereavement leave and first brought up on administrative charges.

That is too long a period to support an inference of causality. McCormick v. Jackson, No. 07

Civ. 7893(JSR), 2008 WL 3891260, at *2 (S.D.N.Y. Aug. 21, 2008) ("the overwhelming majority of cases" reject an inference of causality where more than six months have elapsed between the protected activity and the adverse action).  Moreover, Plaintiff has failed to rebut Defendant's legitimate, non-retaliatory reasons for the adverse employment actions.

### 2.   Plaintiff's EEO Charges and Prior Lawsuit

Plaintiff filed EEO complaints on August 7, 2002, April 4, 2003, and April 10, 2003, and a federal lawsuit on July 16, 2004.  Plaintiff has shown that these were protected acts, that Defendants were aware of the filings, and that adverse acts followed.  The only facts in the record that remotely support causation, however, are the relatively brief time span (three months) between the April 2003 complaint and Plaintiff's designation as a chronic absent, and the briefer time span (two months) between Plaintiff's filing in federal court and the 2005 administrative charges.  Assuming, arguendo, that the temporal proximity is sufficient to establish causation, Plaintiff's case still founders in the second and third stages of the McDonnell Douglas analysis: Plaintiff fails to offer any evidence to indicate that Defendants' proffered legitimate, non-retaliatory reasons for the adverse actions taken against him were pretextual.

### III.   Equal Protection, Section 1981, Section 1983/First Amendment, and City and State Law Claims

Plaintiff has failed to meet his burden as to the remaining claims.  Plaintiff has asserted an equal protection claim on the grounds that he was unfairly "singled out" in being designated a chronic absent, and denied emergency time and bereavement leave.  To state an equal protection claim for selective enforcement, a plaintiff must show that 1) he was treated in a discriminatory fashion with respect to others similarly situated, and 2) such discriminatory

treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994).  Plaintiff has failed to present any evidence, apart from his own speculation, that he was treated differently than similarly situated counterparts or that any of the adverse actions taken against him were motivated by his race or sex.

Since Plaintiff's Section 1981 claims are analyzed under the same McDonnell Douglas burden-shifting framework as his Title VII claims, they fail for the reasons articulated above. Hongyan Lu v. Chase Inv. Services Corp., 412 Fed. Appx. 413, 418 (2d Cir. 2011).

Plaintiff has failed to oppose Defendants' motion for summary judgment on the Section 1983/First Amendment retaliation claim.  The Court therefore deems that claim waived. In any event, there is no support in the record for the claim.  To state a First Amendment retaliation claim, a plaintiff must show that: "(1) the speech at issue was protected; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected speech and the adverse action."  Cotarelo v. Village of Sleepy Hollow Police Dept., 460 F.3d 247, 251 (2d Cir. 2006) (internal quotation marks omitted).  Even if the plaintiff demonstrates these factors, "the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct."  Id.  Here, Plaintiff has failed to adduce any evidence in support of a causal connection; Defendants, by contrast, have furnished uncontested evidence showing that they took adverse actions against Plaintiff for valid reasons wholly unrelated to Plaintiff's protected activity.

Finally, in light of the Court's dismissal of Plaintiff's federal claims, the Court declines to exercise pursuant to 28 U.S.C. § 1367(c)(3) supplemental jurisdiction of the New York City and state human rights law claims.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety. This Memorandum Opinion and Order resolves docket entry no. 46. The Clerk of Court is requested to enter judgment in favor of Defendants on Plaintiff's federal claims and declining to exercise jurisdiction of Plaintiff's New York City and state human rights law claims, and close this case.

SO ORDERED.

Dated: New York, New York
      March 27, 2012

                                        LAURA TAYLOR SWAIN
                                        United States District Judge